# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF NEW MEXICO

_____

UNITED STATES OF AMERICA,

    Plaintiff,

v.                                  Case No. 20-CR-1940-WJ

ALEX VALLEJOS,

    Defendant.

## MEMORANDUM ORDER AND OPINION DENYING DEFENDANT'S MOTIONS TO SUPPRESS EVIDENCE SEIZED FROM MR. VALLEJOS' HOME AND CAR

THIS MATTER comes before the Court upon Defendant's Motion to Suppress Evidence Seized from Mr. Vallejos' Home, filed June 8, 2021 (Doc. 46), and Defendant's Amended Motion to Suppress Evidence, filed June 9, 2021 (Doc. 47). Because both motions rely on a similar set of facts, the Court rules on them together. The Court held a suppression hearing on November 8, 2021. After hearing witness testimony and considering written and oral arguments of counsel, and considering the facts and applicable law, the Court finds that probable cause existed to support the warrantless search of Defendant's car and that the warrant permitting a search of Defendant's residence was proper. Defendant's Motions are therefore both **DENIED**.

## BACKGROUND

Drug Enforcement Administration ("DEA") agents began investigating a suspected drug distributor, Arturo Ruiz ("Ruiz"), and his possible source of supply, Eustacio Montoya ("Montoya"), in September 2018. (Doc. 46 at 1). The events of this investigation are lengthy, detailed carefully and thoroughly in the United States' Response in Opposition to Defendant's

Motion to Suppress Evidence [Doc. 47] (Doc. 51). What follows is a briefer recitation of the facts, drawn from the accounts of both sides for completeness.

I.      **General Context**

On January 1, February 14, and June 9, 2020, DEA agents arranged for a Confidential Source (CS) to meet with Ruiz and purchase heroin. (Doc. 51 at 9, 11, 12). Before and/or after these transactions, agents noticed Montoya or a vehicle registered to him present near the purchase location, at Ruiz's house, or in a suspected storage location known as a "stash house"; as a result, they believed that Montoya was supplying Ruiz with heroin to sell and meeting with him afterwards to collect a share of the proceeds. *Id.* at 10–14. Additionally, on August 14, 15, and 19, as well as September 19 and 26, further communications and sometimes meetings occurred between Ruiz and Montoya. *Id.* at 15–25.

Meanwhile, on March 5, 2020, agents investigated a phone number ending in 5082 based on its communications with Montoya's phone, which they were monitoring. *Id.* at 11. They found that the 5082 number was subscribed to Paul Garcia at 2600 Americare Ct. NW, Albuquerque, NM 87120. *Id.* However, upon investigating whether there was anyone by that name connected to that address in law enforcement databases, the agents found nothing, which suggested to them that the name or address was false. *Id.* at 11–12. However, Defendant established that a driver's license with this name and address does exist. (Doc. 61 at 11, Ex. B). Defendant also established that the Paul Garcia referenced above also has some prior criminal history such that his name should have appeared in some sort of data base that could be searched by law enforcement.

II.     **Defendant's Alleged Involvement**

On August 13, 2020 agents surveilling Montoya's house observed a white Kia sedan parked in the driveway. (Doc. 51 at 14–15). The agents also observed two unidentified men talking

with Montoya in the driveway. *Id.* at 15. One man left in a separate vehicle; the other, who was wearing a white shirt, stayed roughly half an hour longer, then left in the Kia sedan. *Id.* By running the Kia's plates, the agents identified Defendant's wife as the registered owner of the car. They found Defendant's driver's license photo in a law enforcement database and used it to identify him as the man in the white shirt. *Id.* The following day, an agent found out from law enforcement databases that Defendant had a DEA arrest for possible cocaine trafficking in 2006. *Id.*

On September 24, 2020 agents surveilled Montoya's truck as it left a suspected stash house, drove to a business called Z's Custom and Collision, stayed for nearly an hour, and then drove elsewhere in a manner that the United States characterizes as "an effort to evade law enforcement and confirm that no one was following him." *Id.* at 22–23. A law enforcement database search indicated that Defendant had some connection to Z's Custom Collision. *Id.* at 23. Afterward, the DEA agents met with FBI agents who advised them that the FBI had conducted controlled drug buys from Defendant using a confidential source in 2013. *Id.*

Events came to a head on October 2. Montoya and the 5082 number, still unidentified given the possibility that Paul Garcia was a false name, exchanged several texts and calls throughout the morning and early afternoon. After a visit to a restaurant, Montoya texted the 5082 number, "Im ready bud" at 2:01 p.m. and arrived home at 2:02 p.m. *Id.* at 3. Montoya then placed a black object in his car at 2:06 p.m. (Doc. 61 at 13). A guest in a gold sedan arrived, also at 2:06 p.m., and while the guest was still present, Montoya received a response to his text from the 5082 number stating, "Ok" at 2:16 p.m. (Doc. 51 at 3.) Montoya placed a red box in his pick-up truck at 2:25 p.m., then texted the 5082 number, "Whats tha add" [What's the address?] at 2:26 p.m. *Id.* After two brief calls from the 5082 number, Montoya began driving. *Id.*

Agents located Montoya at Montano West Park at 2:53 p.m. after a twenty-eight-minute gap in observation, as the last time he'd been seen was when he put the red box in his truck at 2:25 p.m. (Doc. 61 at 12). A white sedan registered to Defendant's wife arrived at 3:02 p.m. (Doc. 51 at 4). At 3:01 p.m., 3:02 p.m., and 3:03 p.m., Montoya received brief incoming calls from the 5082 number. *Id.* Defendant exited the white sedan, brought a black duffel bag to Montoya's truck, spoke briefly with a landscaper who approached Montoya's truck, and returned to his white sedan with the duffel bag. *Id.* Then, at 3:05 p.m., he got into Montoya's passenger seat and remained there until 3:24 p.m. *Id.* When he left, he was carrying a red box, which according to surveillance photos appeared to be nearly identical to the same box as Montoya had earlier placed into his truck. *Id.* Defendant brought the red box to his own car, placed it in the trunk and then drove away at 3:26 p.m. *Id.*

At 3:38 p.m., agents stopped Defendant's white sedan. *Id.* at 6. Employing a ruse, they "told Defendant that his car matched the description of a vehicle involved in a violent crime case that was being investigated in the area." *Id.* at 7. They required Defendant to exit the vehicle[1] and ordered him to sit or stand on the curb, but they did not force him to the ground or draw their weapons. *Id.* at 7; Doc. 61 at 16. They found the red box in the trunk and questioned him about it; Defendant stated that he did not know the contents of the box but that he had bought a tool from someone. (Doc. 51 at 7). Agents believed the box contained an illegal drug, so they seized the box and a Bernalillo County Sheriff's Deputy hand cuffed Defendant while agents decided on their

---

[1] Agent Polinko testified on direct examination that she asked Defendant if she could search his vehicle for dangerous weapons and that he then exited the vehicle. On cross-examination, Agent Polinko stated that she did not ask Defendant for permission; her testimony was that she told him that she would be searching his car, she asked him if he could step out of the car so she could conduct the search, and he exited willingly and was not forced out of the car. Consent is therefore a disputed issue of fact in this case. However, the agents' actions are justified regardless of whether Defendant consented to the search of the car.

next steps. *Id.* Defendant was then released. *Id.* A laboratory later determined that the substance in the red box weighed 982.9 grams and contained cocaine. *Id.* at 8.

After the encounter ended, the agents discovered that they had not returned Defendant's driver's license, so two sheriff's deputies brought it back to the address it listed: 10020 Calabacillas Court NW, Albuquerque, NM. *Id.* The deputies spoke with Defendant's wife, who confirmed that Defendant lived there. *Id.*

The 5082 number and Montoya did not communicate from the time Defendant arrived at Montano West Park (3:03 p.m.) until after the traffic stop was over. Subsequently, at 3:57 p.m., the 5082 number called Montoya. *Id.* at 8–9. The 5082 number called Montoya again at 4:19 p.m., 4:28 p.m., and 4:30 p.m. *Id.*

## LEGAL STANDARD

The Fourth Amendment's protection against unlawful searches requires that a search warrant be issued by a neutral magistrate, have the support of probable cause, and "particularly describe the things to be seized, as well as the place to be searched." *Bowling v. Rector*, 584 F.3d 956, 969 (10th Cir. 2009) (quoting *Dalia v. United States*, 441 U.S. 238, 255 (1979)). Probable cause exists when the available facts would cause a person "of reasonable caution" to believe "that contraband or evidence of a crime is present." *Florida v. Harris*, 568 U.S. 237, 243 (2013). Far from the measure of reasonable doubt employed in a criminal trial, courts considering probable cause look to the totality of the circumstances as a "practical and common-sensical standard." *Id.* at 244.

To give teeth to these constitutional protections by deterring unlawful conduct, courts have developed the exclusionary rule, which allows for the suppression of certain evidence obtained in violation of the Fourth Amendment's standards. *United States v. Leon*, 468 U.S. 897, 906 (1984).

When a motion to suppress involves a warrantless search, the defendant bears the prima facie burden "of showing the Fourth Amendment was implicated," and if this burden is met, then "the government has the burden of proving its warrantless actions were justified." *United States v. Goebel*, 959 F.3d 1259, 1265 (10th Cir. 2020) (citing *United States v. Carhee*, 27 F.3d 1493, 1496 (10th Cir. 1994)); *see also United States v. Thomas*, 290 F. Supp. 3d 1162, 1167 (D. Colo. 2017) (characterizing defendant's burden as prima facie).

However, when a warrant authorizes a search, courts afford "great deference" to the determination of the magistrate judge. *Leon*, 468 U.S. at 914; *see also Carhee*, 27 F.3d 1493, 1496 (10th Cir. 1994) ("Generally, if the search or seizure was pursuant to a warrant, the defendant has the burden of proof.") (internal quotation omitted). Even so, limitations on that deference exist if there is "knowing or reckless falsity" in the affidavit supporting the warrant, if the magistrate is not "neutral and detached" and acts as a "rubber stamp for the police[,]" if the affidavit is insufficient to determine probable cause (a "bare bones" affidavit), or if the warrant is "so facially deficient . . . that the executing officers cannot reasonably presume it to be valid." *Id.* at 914–15, 923 (quotations omitted). The "knowing or reckless falsity" standard comes from *Franks v. Delaware*, a case holding that after a defendant makes a "substantial preliminary showing" of such content in the affidavit supporting the warrant, alongside a showing of materiality, the Fourth Amendment entitles the defendant to a hearing on the issue. 438 U.S. 154, 155–56 (1978).

## DISCUSSION

I. **Motion to Suppress Evidence Seized From Defendant's Vehicle [Doc. 47]**

*A. Authority of DEA Agents to Conduct a Traffic Stop*

Defendant expresses concern that the DEA agents who conducted the traffic stop of his car were not authorized to stop a vehicle for state and local traffic violations. (Doc. 47 at 6). The

United States responds that the agents did not stop Defendant for a traffic violation, but because they believed he was in possession of illegal drugs. (Doc. 51 at 26). If a DEA agent has probable cause to believe a vehicle contains contraband, she may conduct a stop to search for it. *See United States v. Chavez*, 534 F.3d 1338, 1345 (10th Cir. 2008); *United States v. Alderete*, 753 Fed. Appx. 617, 622–23 (10th Cir. 2018); *United States v. Gonzalez*, 121 F. Supp. 3d 1094, 1164 (D.N.M. 2015).[2] Therefore, the fact that DEA agents and not state police officers initiated a traffic stop does not automatically mean the search was unlawful. A probable cause inquiry remains necessary.

*B.  Probable Cause*

Defendant bears the prima facie burden of showing that the Fourth Amendment was "implicated." *See Goebel*, 959 F.3d at 1265. Defendant states that a stop and search of his vehicle took place at 3:38 p.m. on October 2, 2020. (Doc. 47 at 5). The parties agree that the agents employed a ruse to search Defendant's vehicle rather than present a warrant. *Id.*; Doc. 51 at 7 (agents "used a ruse in an attempt to preserve the integrity of the ongoing investigation"). Probable cause may justify a warrantless vehicle search. *See, e.g., United States v. Beckstead*, 500 F.3d 1154, 1165 (10th Cir. 2007). The question of whether probable cause exists implicates the Fourth Amendment, so Defendant meets his prima facie burden. The United States must next demonstrate that it had probable cause to conduct a warrantless vehicle search. *See Goebel*, 959 F.3d at 1265.

Defendant argues that there was no probable cause for a stop of his vehicle. In support, he states that 1) his conduct while surveilled was "inconsistent with a drug transaction because of its duration and lack of any visible exchange of drugs or money," 2) that he was unidentified as a suspect in the Montoya investigation until then, 3) that "DEA agents lost visual contact with Mr. Montoya for 28 minutes prior to his meeting" with Defendant, 4) that there is no evidence that

---

[2] These cases make this finding implicitly by holding that the DEA agent's probable cause may be imputed to other officers who physically conduct the search.

Defendant is the user of the 5028 phone number, and 5) that the meeting between Montoya and Defendant "occurred in an area with low reported drug crime." (Doc. 47 at 8).

Probable cause requires a "fair probability that contraband or other evidence will be found in a particular place." *United States v. Biglow*, 562 F.3d 1272, 1280–81 (10th Cir. 2009). Ultimately, a finding of probable cause does not rely on whether Defendant had been identified as a suspect, whether his purported criminal history as described by NADDIS and the FBI agents was accurate, or whether Montoya's somewhat odd route away from Z's Custom Collison was consistent with countersurveillance. Instead, the crux of the matter is this: Defendant had an interaction that resembled a drug sale with a man under years-long investigation as a drug supplier.

Having a social interaction with a potentially unsavory acquaintance is not normally a criminal act. However, meeting up with an acquaintance known to frequent the sites of drug purchases, choosing a public park as a meeting place but staying in or near vehicles rather than entering the park itself, transporting a black duffel bag to the acquaintance's truck and then back to one's own car, returning to the acquaintance's truck to sit for nineteen minutes, retrieving a box that resembled one that the acquaintance had placed in his truck shortly before the trip, and bringing it back into one's own vehicle before driving away—as Defendant did here—is far more indicative of an underhanded transaction. Defendant is correct that agents sighted neither money nor drugs. (Doc. 47 at 8). But the form of this transaction is highly unusual in the context of lawful purchases; an ordinary, legal sale rarely involves the back-and-forth, black duffel bag, and entry into the seller's car that this one included. By contrast, the procedure used here is a known method of conducting a drug sale.[3]

---

[3] In *United States v. Drakeford*, 992 F.3d 255, 265 (4th Cir. 2021), the Fourth Circuit explained that in a typical drug sale, a detective would "expect one person to exit the vehicle, enter the other vehicle, exchange drugs, leave their vehicle, and then leave the transaction." In the instant case, Defendant exited his vehicle, brought a duffel bag to

Other facts underscore the likelihood of an illicit transaction. In particular, the timing of the texts from the 5082 number is noteworthy. Montoya placed a red box in his car and immediately texted the 5082 number to inquire about an address; that same afternoon, Defendant met Montoya and picked up a similar-looking red box from Montoya's truck. Additionally, the 5082 number made three calls in three minutes to Montoya right as Defendant arrived at the park to meet him, and then there were no further calls while Defendant and Montoya were together. The timing of these communications paints a picture of two individuals planning to meet for the purpose of exchanging a red box, calling when they got to the meetup location, and then no longer needing to call because they were together.[4]

Despite Defendant's contentions, the gap in surveillance time is not fatal to probable cause. Certainly, it is conceivable that Montoya arranged to meet with someone else before Defendant, or even that he sold drugs to someone else in the black cylindrical container and that the red box Defendant took was a perfectly legal gift or purchase. However, law enforcement need not "rule out all innocent explanations for a suspect's behavior" before achieving probable cause. *Rife v. Oklahoma Dep't of Pub. Safety*, 854 F.3d 637, 644–45 (10th Cir. 2017). Probable cause does not require absolute certainty or an unbroken chain of custody for the red box. A "fair probability," *Biglow*, 562 F.3d at 1280–81, that the red box contained contraband was all the agents needed to conduct a search of the car.[5] Given Defendant's parking lot back-and-forth exchange of a duffel

---

Montoya's truck and back to his own car, entered Montoya's truck, remained there for nineteen minutes, left Montoya's truck, and left the transaction.

[4] Defendant notes the possibility that the landscaper at Montano West Park was the user of the 5082 number. (Doc. 61 at 14). It is more likely that Defendant is the user because the 5082 number placed three calls to Montoya, who had already been at the park for several minutes, right at the time Defendant arrived. This timing suggests that Defendant was the one who called to inform Montoya that he had arrived.

[5] Defendant also argues that the "area with low reported drug crime" in which the interaction between Defendant and Montoya took place weighs against a finding of probable cause. (Doc. 47 at 8). While the crime level of a location may factor into a totality of the circumstances analysis, *Illinois v. Wardlow*, 528 U.S. 119, 124 (2000) (considering context for a *Terry* stop), the Court finds the other circumstances described above to be sufficiently indicative of probable cause.

bag and a red box with Montoya, who by defense counsel's concession at the suppression hearing had given agents probable cause to believe  Montoya had supplied drugs to Ruiz before, a "fair probability" existed that Defendant had just participated in a drug transaction with Montoya, the evidence of which would be found in the red box in Defendant's trunk.

Analogous case law from another circuit also supports a finding of probable cause to search Defendant's vehicle. The government cites *United States v. Piaget*, 915 F.2d 138 (5th Cir. 1990), in which a man who had been under government investigation for drug offenses for over a year, Stewart, placed a gray canvas bag in his truck, then met the defendant, Piaget, in a parking lot. *Id.* at 140. Stewart parked next to Piaget and handed the canvas bag to him. *Id.* Piaget then put the bag in the trunk of his own rental car and drove off to Dallas—the same location a confidential informant had informed the investigating agent that the drugs would be sent. *Id.* The court found probable cause even though the investigating agents had not seen an exchange of money or drugs, as is the case with Defendant Vallejos. *See id.* ("Given Stewart's history of drug dealing and the transfer of the gray bag to Piaget, we therefore agree with the district court that the police had probable cause to stop and search Piaget's car.").

This case and *Piaget* are, if not identical, at least fraternal twins. In both, a person under surveillance with a history of drug activity placed a container in his vehicle, drove to a public place, transferred the container to a person not under independent surveillance, and then drove away. *Piaget* involved a confidential informant indicating that the surveilled individual would send drugs to Dallas, but the instant case involves texts indicating that Montoya would meet the user of the 5082 number—a number with whom Montoya, a suspected drug supplier who had been under DEA investigation for two years, communicated "on a fairly regular basis" from September 18, 2020 to October 2, 2020. (Doc. 51 at 25). Accordingly, given this case's similarities to *Piaget* and

abundant indicia of probable cause, the Court finds that the DEA agents' warrantless search of Defendant's vehicle did not violate the Fourth Amendment.

### C.   Miranda Issues

Defendant argues that he was "detained and in custody" when agents stopped his car and questioned him about the red box. (Doc. 47 at 14). Because he was not read his *Miranda* rights, he believes his statements should be suppressed. *Id.* However, as the United States notes, ordinary traffic stops do not typically implicate *Miranda*. (Doc. 51 at 35 (citing *United States v. Perdue*, 8 F.3d 1455, 1464–65 (10th Cir. 1993))). In *Perdue*, the defendant was forced from his car and held face-down on the ground at gunpoint throughout questioning "while police helicopters hovered above." 8 F.3d at 1464. The Tenth Circuit considered those "highly intrusive" circumstances to be custody for *Miranda* purposes. *Id.* at 1465.

Here, although armed DEA agents carried out the stop, those agents did not draw their weapons, nor did they force Defendant to the ground. (Doc. 51 at 35). Defendant was eventually handcuffed, but this action did not take place until *after* he was questioned. *Id.* at 7. The limited freedom of movement inherent in a traffic stop is insufficient, on its own, to create custody under *Miranda*. *See Berkemer v. McCarty*, 468 U.S. 420, 435–40 (1984) (routine roadside questioning during traffic stop curtails driver's freedom of action, but does not rise to the level of *Miranda* custody); *United States v. Raynor*, 108 Fed. Appx. 609, 613–14 (10th Cir. 2004) (ordering a defendant out of his vehicle and into patrol vehicle without use of weapons or handcuffs does not create *Miranda* custody "even though the Defendants were not free to leave"). The traffic stop Defendant experienced did not involve any unusual restraints on his freedom of movement during the time the agents questioned him. Therefore, *Miranda* warnings were unnecessary at that time, and Defendant's statements need not be suppressed.

II.     **Motion to Suppress Evidence Seized From Defendant's Home [Doc. 46]**

*A. Nexus Requirement*

For a magistrate judge to issue a proper search warrant, she must have evidence of a "nexus" between the "suspected criminal activity and the place to be searched." *United States v. Biglow*, 562 F.3d 1272, 1278 (10th Cir. 2009). In suspected drug trafficking cases, if there is "probable cause to believe that a suspect is involved in drug distribution, there is also probable cause to believe that additional evidence of drug-trafficking crimes (such as drug paraphernalia or sales records) will be found in his residence." *United States v. Sanchez*, 555 F.3d 910, 914 (10th Cir. 2009) (citing *United States v. Sparks*, 291 F.3d 683, 689–90 (10th Cir. 2002)). Indeed, suspected drug trafficking cases are a "special class" in which particular facts are unnecessary to "support the inference that a drug trafficker keeps his supply at his residence." *United States v. Mora*, 989 F.3d 794, 801 (10th Cir. 2021) (holding that alien smuggling does not fall into this "special class") (citation omitted).[6]

The affidavit in support of the warrant to search Defendant's home (Doc. 46-1) alleges facts that meet these requirements. It asserts that the cocaine obtained from the red box in Defendant's vehicle weighed 1.2 kilograms and was worth approximately $30,000 in street value—agents considered this "a distributable quantity" that was "not consistent with personal use." *Id.* ¶ 156. Further, the affidavit explains how agents verified that 10020 Calabacillas Court NW, Albuquerque, NM was Defendant's home based on law enforcement database searches, the address listed on Defendant's driver's license, and a conversation with Defendant's wife at the

---

[6] Notably, *Sanchez* still involved an affidavit that "asserted the presence of illegal drugs at the suspected dealer's house." *United States v. Ingram*, 720 Fed. Appx. 461, 469 (10th Cir. 2017). The Tenth Circuit has declined to announce a "broad rule making a suspected drug dealer's house fair game for searches absent evidence of contraband there." *Id.* However, *Mora* notes that including a statement in the affidavit that in the affiant-officer's experience "drug dealers ordinarily keep their supply, records, and monetary profits at home" has been considered a sufficient gap-filler to link the criminal activity to the residence for purposes of a search warrant. The warrant in the instant case contained a statement of this nature. (Doc. 46-1 at 6).

residence in which she verified that she was Defendant's wife and that they lived at the residence together. *Id.* ¶ 141. Finally, the affidavit links the drug trafficking to the home by stating that drug traffickers commonly keep controlled substances and drug paraphernalia in their residences. *See* Doc. 46-1 at 6. These assertions together meet the special nexus standard for drug trafficking crimes outlined in *Sanchez*.

## B. Particularity

Defendant argues that the warrant was overbroad—a "general warrant" permitting seizure of "various general categories of items." (Doc. 59 at 4–5). The Court disagrees. In *United States v. Cotto*, the Tenth Circuit stated that for a search warrant "[t]o be invalidated as general, the warrant must vest the executing officers with unbridled discretion to conduct an exploratory rummaging through [the defendant's property] in search of criminal evidence." 995 F.3d 786, 798 (10th Cir. 2021); *see also Mink v. Knox*, 613 F.3d 995, 1011 (10th Cir. 2010) (rejecting general warrant for "all computer and non-computer equipment and written materials in Mr. Mink's house, without any mention of any particular crime to which they might be related"). The warrant in this case certainly did not allow for unbridled discretion; the affidavit specifically described the residence to be searched and attached a photo. (Doc. 46-1 at 59). The affidavit also requested permission to search fifteen discrete categories of items and explained why each would be relevant evidence. *Id.* at 5–12, 61. Certainly, there are many items a person might have in their house that would not be subject to seizure under this list.

Regarding the question of whether the warrant was overbroad, even if not general, other cases in the Tenth Circuit permit listing the "generic class" of items sought when the circumstances make it "a virtual impossibility" to identify the fruits and instrumentalities of the crime with precision. *United States v. Harris*, 903 F.2d 770, 775 (10th Cir. 1990) (permitting such a warrant

in a drug trafficking case); *see also United States v. Hervey*, 804 Fed. Appx. 969, 972 (10th Cir. 2020) (permitting a similar warrant in a drug sale case); *United States v. Le*, 173 F.3d 1258, 1271–72 (permitting a search for "any explosives, explosive materials and parts" following Harris because it allows officers to "distinguish between items that may or may not be seized"). The warrant in this case describes fifteen such categories clearly, in line with the descriptions in *Harris*. The Court therefore finds that the warrant in this case was not overbroad.

## C. *Franks Issues*

Finally, Defendant seeks a *Franks* hearing. A defendant may request a *Franks* hearing when he makes a "substantial preliminary showing that a false statement knowingly and intentionally, or with reckless disregard for the truth, was included by the affiant in the warrant affidavit, and if the allegedly false statement is necessary to the finding of probable cause[.]" *Franks v. Delaware*, 438 U.S. 154, 155–56 (1978). Two prongs are necessary: the affidavit must contain a "reckless misstatement or omission" and that misstatement must be material such that without it, the warrant could not have been issued. *United States v. Moses*, 965 F.3d 1106, 1110 (10th Cir. 2020).

Here, Defendant argues that the affidavit "represented" that the 5082 number "was utilized by Mr. Vallejos" when that claim was not confirmed by agents. (Doc. 46 at 14). Defendant takes issue with the affidavit's failure to mention that Montoya met with another individual at his house before his meeting with Defendant and the failure to mention that the 5082 number was subscribed to Paul Garcia. *Id.* at 14–15. However, even if the affiant was reckless by including or omitted the contested information, the information in question is not material. The special standard to search the homes of suspected drug traffickers under *Sanchez* requires only three pieces of information: the evidence of drug trafficking (that is, the brick of cocaine found in Defendant's vehicle),

evidence that Defendant lived at the address to be searched, and the statement that drug traffickers often keep narcotics in their homes. *See Sanchez*, 555 F.3d at 914. Agents therefore could have obtained a warrant to search the home even without the details regarding the 5082 number or discussion of another individual at Montoya's house before Montoya met with Defendant. Based on the lack of materiality, the Court denies Defendant's request for a *Franks* hearing.

## CONCLUSION

Defendant moved to suppress the evidence agents found when searching his vehicle without a warrant, the statements he made to agents at that time, and the evidence agents found when executing a warrant to search his home. Agents had probable cause to search Defendant's vehicle based on his behavior during his meeting with Montoya, a suspected drug supplier who was the subject of a years-long investigation, and his receipt of Montoya's red box, which was likely to contain illegal drugs. Agents' brief detention of Defendant during the traffic stop did not rise to the level of custody, so *Miranda* did not attach to the statements Defendant made at that time. Finally, under the special nexus requirement for drug trafficking cases that the Tenth Circuit articulated in *Sanchez* and recently confirmed in *Mora*, the warrant sufficed to search Defendant's home. Defendant's motions are therefore **DENIED**.

**IT IS SO ORDERED.**

_____
WILLIAM P. JOHNSON
CHIEF UNITED STATES DISTRICT JUDGE